UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

JENNIFER BLOOD,

                Plaintiff,

v.                                        Case Number 11-CV-11802
                                        Honorable Thomas L. Ludington

CITY OF BAY CITY,

                Defendant.

_____/

**OPINION AND ORDER GRANTING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

      This gender discrimination case arises from the termination of Plaintiff Jennifer Blood's employment with Defendant City of Bay City.  Plaintiff contends that she was reprimanded and then had her employment terminated because she was a woman.  Plaintiff acknowledges, however, she has no evidence that she was reprimanded, then terminated, because she was a woman.  And the undisputed evidence is that Plaintiff was reprimanded for violating department rules and regulations, then had her employment terminated for these violations, as well as for insubordination, refusal to report to work, and job abandonment.  Because Plaintiff has no direct evidence of discrimination, and because she does not demonstrate that Defendant's legitimate, non-discriminatory reasons for reprimanding her, then terminating her employment, are pretextual, Defendant is entitled to summary judgment.

**I**

**A**

      Plaintiff's maiden name is Mercer.  Pl. Dep. 4, Apr.  27, 2012, *attached as* Def.'s Mot. Summ. J. Ex. B.  From 2000–2003, she was Mrs. Allan Kory.  Pl. Dep. 4.  From 2005– 2010, she

was Mrs. Brad Peter.  Pl. Dep. 5.  And since 2010, she has been Mrs. William Blood.  Pl. Dep. 5.

Plaintiff is the biological mother of two children, Kember and Kameron.  Pl. Dep. 9.  Kember's

biological father is Mr. Kory; Kameron's biological father is Mr. Peter.  Pl. Dep. 10–11.

From 2003 to July 2010, Plaintiff was a Bay City police officer.  Messrs. Peter and Blood

were also Bay City Police officers during this time (Mr. Blood no longer is).  Plaintiff asserts

that the chief of police was upset that Plaintiff separated from one officer, began a relationship

with a second, then divorced the first officer, and married the second.  Pl. Dep. 367–68.  But

Plaintiff acknowledges that she has no evidence of the chief of police's feelings — and no

evidence that the gentleman treated Plaintiff differently because she was a woman.  Pl. Dep.

367–74.  (Indeed, as detailed below, Plaintiff acknowledges that she has no evidence that any of

the disciplinary actions taken against her were based on her gender.)

**B**

Plaintiff's most concrete allegations of discriminatory animus concern the current deputy

chief of police, Thomas Pletzke.  *See* Pl. Dep. 119–21.  Recounting how she was treated

differently by the gentleman, Plaintiff recalls, "When I initially started working there, he did not

treat me like every other officer."  Pl. Dep. 119.  She elaborates:

> I fetched his coffee every morning.  Upon me requesting that he didn't ask me to
> get that anymore, he kind of laughed and said, don't talk to me like that or I'll
> punch you in the throat.  I felt uncomfortable because after some time of the
> fetching the coffee, some of the other officers informed me that he was ogling
> and staring at my rear end every time I walked away.

Pl. Dep. 119.  These incidents allegedly occurred in 2003.  Pl. Dep. 120.  Plaintiff asserts that

Pletzke (at the time a sergeant) also referred to her as "toots" and "sweetie" in 2003.  Pl.'s Resp.

to Def.'s Mot. 10.  But, Plaintiff also implicitly acknowledges, he has not since.  *See id.*

**C**

Plaintiff took maternity leave in 2006.  *See* Pl. Dep. 120.  At the time, Pletzke was in charge of firearms training.  When Plaintiff returned from maternity leave, "I went into the training, the first four hours was classroom.  During that first four hours of classroom, I was pulled aside and told that if I was breast feeding I would not be able to continue."  Pl. Dep. 120.  The officers conducting the training, Troy Sierras and Kevin Klein, told Plaintiff that "if you're firing lead and breast feeding it's not a good combination, it can be harmful to the child."  Pl. Dep. 129–30.  Plaintiff informed them that she was breastfeeding and chose not to complete the training.  Pl. Dep. 120.  Later she consulted her gynecologist, who told her that the idea that the lead exposure that comes with firing a weapon could harm her child was "ridiculous."  Pl. Dep. 130.

Plaintiff feels that this incident demonstrates that she was treated differently because she was a woman (her husband at the time, Officer Peter, was not asked to leave the training).  Pl.'s Resp. to Def.'s Mot. 1–3.  But, Plaintiff also acknowledges, this incident did not constitute an adverse employment action.  *Id.*

**D**

In 2008 or 2009 (Plaintiff does not recall precisely when), she received workers' compensation for two weeks.  Pl. Dep. 66.  She recalls: "I had fallen on a traffic stop and had an avulsion fracture in my right hand and I was off for a couple weeks I think."  Pl. Dep. 66.  Specifically, she injured the mid-finger knuckle on her right index finger, her trigger finger.  Pl. Dep. 67.

Unable to pull the trigger of her weapon, when Plaintiff returned to work she was placed on light duty (desk duty) for "a few months."  Pl. Dep. 72.  As a condition of returning to regular

duty, Plaintiff was required to re-qualify with her weapon. Pl. Dep. 70. After Plaintiff experienced difficulties firing the weapon, she was ordered to see her personal physician, Dr. Exstein. Pl. Dep. 79–81. She remained on light duty until she did.

When Plaintiff saw Dr. Exstein, he ordered an additional three weeks of physical therapy. Pl. Dep. 78–81. Plaintiff feels that the physical therapy was unnecessary and that she could have returned to regular duty immediately. Plaintiff does not think, however, that Dr. Exstein treated Plaintiff differently because she is a woman. Pl. Dep. 80–81. And Plaintiff acknowledges that in ordering the additional physical therapy Dr. Exstein was exercising his independent medical judgment, not carrying out instructions from Defendant. Pl. Dep. 81. Nevertheless, Plaintiff feels that this incident is evidence of discriminatory animus — she just isn't sure whose. Pl. Dep. 81–82. Discussing the incident in her deposition, Plaintiff was asked:

> Q: Are you claiming that you were somehow treated differently as it relates to this issue because you're a female?
> A: Yes.
> Q: All right. And you can't tell me who treated you differently at the department, correct?
> A: I know it was supervision.
> Q: Okay. But you don't know who from supervision?
> A: No.
> Q: And you don't know why?
> A: No.

Pl. Dep. 82. Later in her deposition, Plaintiff acknowledged that "they had a reason to keep me on light duty." Pl. Dep. 387. Following up, counsel asked: "So your thought process that you were being discriminated against is just not accurate, right?" Pl. Dep. 387. "Sure," answered Plaintiff. Pl. Dep. 387.

**E**

At some point (again, Plaintiff does not recall when), she applied for a position on the VIPER unit.  Pl. Dep. 104.  She did not get the position.  Pl. Dep. 106.  The reason, she asserts, is that she is a woman.  Pl. Dep. 106.  "I was told by officers that worked in the unit that they didn't want a female working with them," Plaintiff recalled at one point in her deposition.  Pl. Dep. 106.  When pressed, Plaintiff acknowledged that the only officer who told her that he didn't want a woman working on the unit was her husband, Officer Blood.  Pl. Dep. 108.  Other than the comment from Officer Blood, Plaintiff further acknowledged, she has no evidence that she was discriminated against regarding the VIPER unit position.  Pl. Dep. 110.

**F**

On the night of October 7, 2009, Plaintiff was dispatched to respond to a report of breaking and entering at the Baytown subsidized housing development on the east side of Bay City.  Pl. Dep. 401, 413.  She and another officer, Officer Richnak, responded to the call.  Because Plaintiff was assigned to the East side of Bay City, Officer Richnak assigned to the west side, as a matter of protocol it was Plaintiff's run.  Pl. Dep. 408–09.

After arriving, Plaintiff attempted to interview one of the victims.  Pl. Dep. 412.  The gentleman declined to provide any information, other than his name.  Pl. Dep. 412.  So Plaintiff walked over to Officer Richnak, where she overheard a second victim "say something about them fighting with someone named Black."  Pl. Dep. 414.  Recognizing the street name "Black," Plaintiff went back to her car and ran down his information.  Pl. Dep. 414.

About this time, the night shift arrived at the scene.  Pl. Dep. 414.  Among the officers was Plaintiff's estranged spouse, Officer Peter.  Pl. Dep. 414.  He told Plaintiff that he had been

unable to arrange child care for their son Kameron, and so had left him asleep in a van in the police parking lot.  Pl. Dep. 416.

Plaintiff left the scene "immediately afterwards."  Pl. Dep. 460.  She did not clear leaving with her supervisor.  Pl. Dep. 421.  No other officers left (Officer Richnak, for example, stayed several more hours at the scene).  Pl. Dep. 417.

Plaintiff arrived back at the station at 10:13 pm.  Pl. Dep. 463.  She went inside, changed into plain clothes, and picked up her son at 10:21.  Pl. Dep. 463.  Plaintiff maintains that her leaving the scene "didn't have anything to do with" picking up her son.  Pl. Dep. 469.  In Plaintiff's deposition, she was asked:

> Q: Brad Peter arrived at the scene and told you that your son was in the vehicle and within seconds you left.  But you didn't tell the investigating officer that, did you?
> A: I guess not, if that's what you're saying.
> Q: What I'm saying is, you didn't tell him that because you were trying to hide that fact, right?
> A: No.
> Q: Then why didn't you tell him that?
> A: Because it didn't pertain to leaving the scene.
> Q: It didn't pertain?
> A: Right.
> Q: It didn't have anything to do with the fact that within seconds after him telling you, you went back to the station?
> A: Right.

Pl. Dep. 469.  Plaintiff was interviewed three times about leaving the scene.  Pl. Dep. 467–69.  In the first two interviews, Plaintiff did not mention that her son was waiting in the police station parking lot.  Pl. Dep. 467–69.  In the third, she did.  (As discussed below, both Plaintiff and Officer Peter received a written reprimand for leaving the child unattended in the vehicle.  Plaintiff feels this is discriminatory because, although she was less culpable than Officer Peter, she received the same punishment.)

**G**

Also in October 2009, Plaintiff began a romantic relationship with Officer Blood.  Pl. Dep. 491.  On the night of October 13, 2009, the relationship came to the attention of Officer Blood's wife, Mrs. Karen Blood.  Pl. Dep. 497.

Plaintiff recalls that the incident began when Mrs. Blood "showed up at his camper and I was there.  She kind of went berserk, wanting to know who else was there with him.  She threw rocks and slapped him in the face."  Pl. Dep. 497.  Mr. Blood filed a criminal complaint against his wife for assault.  Pl. Dep. 497.

On October 14, Plaintiff and Mr. Blood disclosed their relationship to the department.  Pl. Dep. 498.  Sometime later, both Plaintiff and Mr. Blood were issued written reprimands for violating the "Bay City Close Personal Relationship Policy."  Pl. Dep. 508.  Plaintiff does not contend that this discipline was discriminatory.  Pl. Dep. 508–09.

**H**

In December 2009, Plaintiff underwent eye surgery.  Pl. Dep. 121.  Prior the surgery, her doctor's office faxed Family Medical Leave Act information to the Bay City Police Department.  Pl. Dep. 123.  The faxed document explained that the surgery was to address double vision and poor visual acuity.  Pl. Dep. 328.  This information was wrong, Plaintiff contends, explaining: "the paperwork they got was a mistake as far as this eye surgery went."  Pl. Dep. 123.  The surgery was not corrective, Plaintiff further explains, but "purely cosmetic."  Pl. Dep. 285, 304.

After Defendant received the document, Plaintiff was taken off active duty.  She contends that this was discriminatory, but acknowledges that she has no evidence that the decision had anything to do with her sex.  Pl. Dep. 288–89.  In Plaintiff's deposition, she was asked:

> Q: Now, do you have any documents that suggest that the chief or deputy chief or anyone in command at the police department made their decisions relating to your time off because of your gender?
> A: I have no documentation for that, no.
> Q: Do you have any witnesses who will testify that that was why they made the decisions?
> A: No.

Pl. Dep. 288.   The faxed document, she acknowledges, informs the reader that Plaintiff's condition rendered her unable to perform her duties as a police officer.  Pl. Dep. 329.

## I

Following eye surgery in December 2009, Plaintiff was required to re-qualify with her weapon and squad car.  Pl. Dep. 355.  Acknowledging that this was reasonable, Plaintiff testified in her deposition "I can see why they wanted me to shoot and drive when I came back."  Pl. Dep. 355.  What was unreasonable, Plaintiff asserts, is that the requalification examination didn't occur until March or April 2010 — about four months after she had returned.  Pl. Dep. 361.  Thus, for four months she was forced to ride with a fellow officer.  Pl. Dep. 361.

Plaintiff assumes that the chief of police treated Plaintiff this way because Plaintiff was in the process of divorcing one officer while dating a second.  Pl. Dep. 367–68.  But, as noted, Plaintiff acknowledges that she has no evidence of that — indeed, Plaintiff acknowledges that she has no evidence that the chief of police treated Plaintiff differently because she was a woman.  Pl. Dep. 367–74.

## J

In 2010, Plaintiff divorced Officer Peter.  Pl. Dep. 137–38.  Following the divorce, Plaintiff contends, Pletzke (by this time the deputy chief) treated Officer Peter more favorably than Plaintiff.  Pl. Dep. 121.  She elaborates: "I think when he first found out that I had filed a divorce with my husband, he offered my husband stress leave, unlimited amount of stress leave

and pulled me in the office and told me that if my personal life involved work or interrupted work, he was going to kick me and kick me hard." Pl. Dep. 121.

Plaintiff acknowledges that she did not report what she believed to be inequitable treatment to Defendant. She further acknowledges that she was aware of Defendant's anti-harassment policy, which prohibits discrimination based on sex. Pl. Dep. 199. Each year, Plaintiff was required to complete a form reporting whether she had been subject to sexual harassment. Pl. Dep. 201. Each year, including the year of her divorce, she reported that she had not been harassed because of her sex. Pl. Dep. 202.

## K

In March 2010, Plaintiff was suspended for five days for leaving the scene of the investigation in October 2009. Her husband, Officer Blood, was suspended for eight days for five separate violations (including three instances of falling asleep behind the wheel). Pl. Dep. 245–46. Plaintiff feels that he was treated more favorably than she was. Pl. Dep. 246. In her deposition, Plaintiff was asked:

> Q: Okay, all right. So your problem is that Bill had these, and you don't know what they are, violations pending and got eight days off and you had one violation pending and you got five days off?
> A: Correct.
> Q: And you think that's not fair?
> A: Correct.
> Q: And you don't know what the nature of each of his violations were, right?
> A: Correct.
> Q: And you don't know what the findings were as it relates to each of those violations, correct?
> A: Correct.

Pl. Dep. 246. Plaintiff also asserts that her former husband, Officer Peter, was treated more favorably. As noted, for leaving their child unattended in the police parking lot in October 2009 Plaintiff and Officer Peter received the same punishment — a written reprimand. Pl. Dep. 475–

77.  This was discriminatory, Plaintiff asserts, because "[h]e's the one that initiated that whole situation and was given the exact same [punishment]."  Pl. Dep. 475–76.  Plaintiff acknowledges that she has no other evidence that her gender factored into this disciplinary decision.  Pl. Dep. 477–78.  And, although she filed a grievance about her treatment, her grievance did not contend that she was treated differently because of her sex.  Pl. Dep. 478–79.

Plaintiff also acknowledges that she has no evidence that she was treated in the manner she was because of her sex.  Pl. Dep. 445–46.  Regarding the discipline imposed for leaving the scene, for example, Plaintiff was asked in her deposition:

> Q:  [Y]ou told me earlier you believe [Officer] Rowell did the investigation, is
>     that right?
> A:  I think so, yeah. . . .
> Q:  Do you know, do you have any evidence, any documents that show that
>     Rowell reached [his] conclusion because you're a female?
> A:  No documents, no.
> Q:  Do you have any evidence that he reached that conclusion or treated you
>     differently because you were a female?
> A:  No paper documents, no.
> Q:  Well, I didn't ask you about paper documents, I asked you about evidence.
> A:  Right.  No.
> Q:  Okay.  Do you have any witnesses who will testify that Rowell reached that
>     conclusion because you're a female?
> A:  No.
> Q:  All right.  Are you claiming that Rowell discriminated against you because of
>     your gender?
> A: No. . . .
> Q:  Are you claiming that anyone in that chain of command discriminated against
>     you because you're a female?
> A:  I don't know.
> Q:  Okay. Do you have any evidence that anyone in that chain of command
>     discriminated against you because you're a female?
> A: I have no documentation or anything I can provide, no.

Pl. Dep. 444–46.

**L**

Elsewhere in her deposition, Plaintiff identifies three other male officers that she asserts

were disciplined more leniently than she was.  *See* Pl. Dep. 254–74.  The first is Officer Aldrich.

Pl. Dep. 254.  In her deposition, Plaintiff was asked:

> Q:  And you also claim that Mr. Aldrich was the subject of multiple
>      investigations?
> A:  Correct.
> Q:  What was he being investigated for?
> A:  I have no idea.
> Q:  Do you know who did the investigations?
> A:  No.
> Q:  Do you know what the findings of the investigator were?
> A:  No.
> Q:  Do you know if they concluded that he was responsible or excuse me, whether
>      the allegations against him were sustained or not?
> A:  No.
> Q:  Okay.  What's the comparison you're making between yourself and Mr.
>      Aldrich?
> A:  Because I know that he had several ongoing investigations, he told me that he
>      did as well as like Bill did.  And neither of them were suspended with pay and
>      placed in their house for certain hours of the day as I was. . . .
> Q:  Okay.  So you don't know what the violations were, you don't know what the
>      findings were and you don't know how they were the same or different to
>      your violations, right?
> A:  Correct.

Pl. Dep. 254–55.  Plaintiff acknowledges that she has no evidence that Aldrich was treated more

leniently than Plaintiff because of his sex.  Pl. Dep. 257, 268.  In her deposition, she was asked,

for example,

> Q:  [D]o you know of any witnesses who will testify that the amount of
>      punishment was determined because of your gender or his?
> A:  No.
> Q:  Do you know of anyone who will testify that there was some unequal
>      treatment because of gender?
> A:  No.
> Q:  Do you have any documents that reflect gender was a consideration in the
>      process?
> A:  No.

Pl. Dep. 268.

The second officer that Plaintiff asserts was disciplined more leniently than she was is Officer Ritchy.  Pl. Dep. 264–68.  After being arrested for drunk driving while off duty, Officer Ritchy received a five day suspension — the same punishment Plaintiff received for leaving the scene of an investigation.  Pl. Dep. 265.  Plaintiff acknowledges that she has no evidence that Ritchy's punishment — or her's, for that matter — has anything to do with sex.  Pl. Dep. 267–68.  In her deposition she was asked:

> Q: Okay.  And do you know of any witnesses who will testify that the amount of punishment was determined because of your gender or his?
> A: No.
> Q: Do you know of anyone who will testify that there was some unequal treatment because of gender?
> A: No.
> Q: Do you have any documents that reflect gender was a consideration in the process?
> A: No.

Pl. Dep. 268.

The third officer is Officer Doud.  Pl. Dep. 269.  In 2006 or 2007 (Plaintiff does not recall precisely when), Doud was videotaped punching and kicking a handcuffed suspect in the police station booking room.  Pl. Dep. 269.  Doud was suspended (again, Plaintiff does not know precisely how long).  Pl. Dep. 272.  Once again, Plaintiff acknowledges that she has no evidence that Doud's punishment has anything to do with sex.  Pl. Dep. 273.  Again, in her deposition she was asked:

> Q: [D]o you have any evidence that Doud was treated differently because of his gender?
> A: No.
> Q: Do you have any documents or witnesses who will say, hey, he got a break because he was a man?
> A: No. . . .
> Q: Did you ever report this perceived inequity in treatment to anyone at the department?

A:  No.
Q:  Did you ever report it to anyone at the City?
A:  No.

Pl. Dep. 273–74.

## M

In June 2010, Plaintiff and Mr. Blood were involved in a bar fight in Bay City.  Pl. Dep.

510.  The fight began, Plaintiff recounts, after a woman commented about Plaintiff's shirt.  Pl.

Dep. 519.  Plaintiff kept walking; Mr. Blood didn't.  Pl. Dep. 519.  When Plaintiff went back to

see what Mr. Blood was doing, the woman shoved Plaintiff.  Pl. Dep. 519–20.  Plaintiff recalls:

> Then after she shoved me, I kind of wrapped her up and we fell to the ground and
> we were fighting at that point.  And I just felt getting, I got kicked in the back of
> the head and that's when these two guys came up from I don't even know where
> and started fighting with Bill.  I got the girl off of me, I think people were coming
> out of the bar and what I assume is the bartender came out and broke us up.

Pl. Dep. 520–21.  "I remember punching her when we were on the ground," Plaintiff further

recounts, "because she had me by the hair and I was punching her to get her to let go of me."  Pl.

Dep. 525.  Asked where she punched the other woman, Plaintiff recalled: "In the face."  Pl. Dep.

527.

Plaintiff did not notify her superiors of the incident.  Pl. Dep. 537–38.  Someone did,

however, and the next day officers investigating the fight contacted Plaintiff.  Pl. Dep. 545.  The

investigation concluded that Plaintiff and Mr. Blood had violated two departmental rules.  Pl.

Dep. 548.  The first prohibited conduct that discredits the reputation of the department or its

officers.  Pl. Dep. 548.  The second required truthfulness.  Pl. Dep. 548.  Plaintiff acknowledges

that this discipline was not motivated by her sex.  Pl. Dep. 548.

**N**

In July 2010, Plaintiff and Mr. Blood were in a car accident.  Pl. Dep. 581.  The day begin when Mr. Blood went golfing with friends.  Pl. Dep. 582.  Plaintiff met him at a bar around 4 pm.  Pl. Dep. 582.  They left the bar around 11 pm. Pl. Dep. 590.  Because Mr. Blood was intoxicated, Plaintiff drove.  Pl. Dep. 590.  While attempting to maneuver around a disabled vehicle at a stop light, she backed into another vehicle.  Pl. Dep. 592.  Plaintiff acknowledges that she had "one or two drinks" before the accident.  Pl. Dep. 581.

Mr. Blood got out to assist the disabled vehicle while Plaintiff spoke with the driver of the car that she had hit.  Pl. Dep. 593–94.

For reasons not clear to Plaintiff, Mr. Blood then got into a shouting match with a passing bicyclist.  Pl. Dep. 596.  Plaintiff responded by going across the street to a convenience store, buying a "big" bottle of vodka, opening the bottle, and starting to drink in front of the store.  Pl. Dep. 600.  She explains:

> I went in, I bought one bottle of Smirnoff.  I came back outside, I opened it up, I took maybe one or two drinks out of it and I was [looking] over at Bill, pouring it out on the sidewalk.  Threw it away and then went and got another one and did the same thing.

Pl. Dep. 604.  Plaintiff's actions did not get Mr. Blood's attention.  Pl. Dep. 610.

The bicyclist's parents arrived.  Pl. Dep. 610.  And so Plaintiff stopped drinking, crossed the street, and extricated Mr. Blood from the situation.  Pl. Dep. 610.  Mr. Blood then drove her home.  Pl. Dep. 615.

Again, Plaintiff did not notify her superiors of the incident.  Pl. Dep. 621.  Again, however, someone filed a complaint and an investigation was initiated.  Pl. Dep. 621.  She was found responsible for violating the department's prohibition against engaging in conduct

endangering the reputation of an officer and disciplined.  Pl. Dep. 623.  She acknowledges that she has no evidence that this discipline was based on her sex.  Pl. Dep. 623–25.

### O

Four days after the car accident, Plaintiff was suspended with pay.  Pl. Dep. 628–29. Between 8 am and 4 pm Monday through Friday, if she left home Plaintiff was required to contact the shift commander.  Pl. Dep. 629.

One day later, she left home without contacting the shift commander.  Pl. Dep. 630. Plaintiff contends that she called, but that no one answered the phone.  Pl. Dep. 631.  So she called dispatch and left a message.  Pl. Dep. 632.  She was quickly summoned to the station and told that she must contact the shift commander, not simply leave a message.  Pl. Dep. 638.

For the next two weeks, Plaintiff abided by the terms of her suspension.  Pl. Dep. 645–46. That changed on August 2.  Pl. Dep. Pl. Dep. 649.  In her deposition, Plaintiff was asked: "Now, on August 2nd, 2010, did you violate the directive of the chief of police as it relates to your on-duty paid suspension?"  Pl. Dep. 649.  "Sure.  I violated it," Plaintiff responded.  Pl. Dep. 649. Plaintiff explains that she violated its terms to take a family vacation in northern Michigan for several days.  Pl. Dep. 655.

### P

The afternoon Plaintiff left, she received a call from Sergeant Charter informing her that she was required to attend a human resources meeting the following morning (August 3).  Pl. Dep. 657.  Plaintiff called back, explaining that she was "not able to mentally come in," that she was "not in the right state of mind."  Pl. Dep. 665.  In Plaintiff's deposition, Defendant's counsel inquired: "So you didn't explain to him specifically why you were not in the right mental state of mind?"  Pl. Dep. 667.  "No. We didn't go into specifics," Plaintiff responded.  Pl. Dep. 667.

Instead of returning, Plaintiff stayed in Mio, Michigan for a few days, then travelled to Alpena, later to Mackinaw.  Pl. Dep. 672.  She understood that this constituted insubordination and that this would justify her termination.  Pl. Dep. 673.  As she explains it, she understood that her "job was on the line" because of her insubordination.  Pl. Dep. 677.  But, Plaintiff explains, "I couldn't trust myself to be in the same vicinity of [the chief of police and deputy chief]."  Pl. Dep. 673.  Asked why in her deposition, Plaintiff explained that she felt these gentlemen were treating her unfairly in repeatedly disciplining her.  Pl. Dep. 675.  She was asked:

> Q: So do you think your —were you angry at your sergeants who said you have
>     violated all these rules and regulations?
> A: To some extent.
> Q: Okay.  But you blamed it on the chief.
> A: Exactly.
> Q: Why the chief?  What else did he do, other than get the paperwork in, review
>     it, make a determination whether the facts contained in the paperwork are
>     sufficient to support the allegations?  What else did he do in the process?
> A: I felt he was the one and the deputy chief are the ones that initiated it all.
> Q: Okay. What evidence do you have that the chief is the one who initiated it all?
> A: It was just a feeling.

Pl. Dep 674–75.  Inquiring into the factual basis for Plaintiff's belief that the chief and deputy chief "initiated it all," counsel asked:

> Q: Do you have any witnesses who will tell you the chief started these
>     investigations or caused them to be started?
> A: I have no idea.
> Q: So the answer is, no, you don't?
> A: Right.  I don't know what witnesses would say.
> Q: You don't have any documents and you don't know of any other evidence that
>     shows it?
> A: Right.
> Q: How about the deputy chief?
> A: The same.
> Q: The same.  You have no documents, you have no evidence that he was the one
>     who instigated these or caused these to occur or created the results?
> A: Right.
> Q: You said that you didn't feel that you could be in the same room with these
>     people.  What does that mean?

A: I don't know.  I didn't know.  I felt like I was not myself, like all of these
   things had made myself being reasonable a far grasp at anything I could
   handle.

Q: Did you feel out of control at the time?

A: Kind of.  My feelings were, yes. . . .

Q: Okay.  So you believe it was your psychiatric — excuse me, your emotional
   state?

A: Correct.

Q: When Pletzke gave you that directive, did you realize your job was on the
   line?

A: Yes. He — when, on the phone?

Q: Yes.

A: Yes.  He told me it was. . . .

Q: And you didn't contact human resources and ask human resources for another
   date or time?

A: I never contacted human resources, no.

Q: And you didn't contact human resources and say, look, I don't think I can be
   around the chief, I don't think I can be around the deputy chief, I got these
   feelings of anger or anxiety toward them, I want to talk to you guys directly.
   You didn't do that?

A: No.

Q: And you didn't contact HR and say, look, I think I'm being discriminated
   against because of my gender and I want to make a complaint against the
   chief, deputy chief or anyone else at the department; right?

A: Right.

Q: You just didn't show up.

A: Right.

Pl. Dep. 675–78.

## Q

The administrative hearing was held as scheduled on August 3, 2010.  The chief of

police, the deputy chief, the union representative, and the human resources director were present.

*See* Termination Letter, attached as Def.'s Mot. Ex. P.  Plaintiff was not.  *Id*.

At the hearing, Plaintiff was found to have violated police department rules regarding

insubordination, refusal to report to work, and job abandonment — all terminable offenses.  *Id*.

Her employment with Defendant was terminated, with the termination letter explaining:

On Monday, August 2, 2010, you were ordered by the Police Chief to attend a
10:00 a.m. meeting in Human Resources on Tuesday, August 3, 2010.  This

-17-

meeting was to allow you an opportunity to respond to three different investigations which included multiple disciplinary allegations. You failed to show up for this meeting and utilize your opportunity to respond to these allegations. . . .

In addition to your failure to report to your meeting in Human Resources, you were also ordered by the Police Chief and Deputy Police Chief to immediately report to the station on Monday, August 2, 2012, which you also failed to do. According to Police Department Rules and Regulations, this is a reflection of "Job Abandonment", "Refusal to Report", and "Insubordination" — all 5th Grade Offenses.

Effective today, Tuesday, August 3, 2010, your employment with the Bay City Police Department has been terminated. Termination of your employment status results from a series of disciplines . . . and your failure to report to work as ordered on both Monday, August 2nd and Tuesday, August 3rd, 2010.

I regret having to take this action. However, the City of Bay City will not tolerate this behavior.

*Id.* The letter was sent by Defendant's director of human resources, Ms. Wendy White.

## R

In April 2011, Plaintiff filed suit against Defendant in this Court. The single-count complaint alleges that Defendant discriminated against Plaintiff based on her gender in violation of Title VII of the Civil Rights Act of 1964 and Michigan state law.

Defendant now moves for summary judgment.

## II

A motion for summary judgment should be granted if the "movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of identifying where to look in the record for evidence "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the opposing party who must "set out specific facts showing a genuine issue for trial." *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted).  The court must view the evidence and draw all reasonable inferences in favor of the non-movant and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Id.* at 251–52.

### III

"It shall be an unlawful employment practice for an employer," Title VII provides, "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  Michigan's Elliot Larsen Civil Rights Act (ELCRA) contains a similar prohibition against an employer discriminating against an employee on the basis of an employee's gender.  Mich. Comp. Laws § 37.2202(1)(a).  For analytical purposes, the ELCRA resembles federal law and the same general evidentiary burdens prevail as in Title VII cases.  *See In re Rodriquez*, 487 F.3d 1001, 1008 n.2 (6th Cir. 2007); *Humenny v. Genex Corp*., 390 F.3d 901, 906 (6th Cir. 2004).

"In order to establish a Title VII employment discrimination claim," the Sixth Circuit instructs, "a plaintiff must either present direct evidence of discrimination or introduce circumstantial evidence that would allow an inference of discriminatory treatment."  *Johnson v. Kroger Co.*, 319 F.3d 858, 864 (6th Cir. 2003) (citing *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 572 (6th Cir. 2000)).

"Direct evidence is evidence that, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions."  *Thompson v. City of Lansing*, 410 F. App'x 922, 929 (6th Cir. 2011) (internal quotation marks omitted) (quoting *Wexler v. White's Fine Furniture, Inc*., 317 F.3d 564, 570 (6th Cir. 2003)).  "Consistent with this

definition, direct evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group." *Kroger Co.*, 319 F.3d at 865.

"Under the direct evidence approach," the Sixth Circuit explains, "once the plaintiff introduces evidence that the employer terminated him because of his race or other protected status, the burden of persuasion shifts to the employer to prove that it would have terminated the plaintiff even had it not been motivated by discrimination." *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 572 (6th Cir. 2000) (citing *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1081 (6th Cir. 1994)).

"If a plaintiff cannot present direct evidence of discrimination, he may prove his claim through circumstantial evidence, applying the familiar burden-shifting analysis set forth in *McDonnell Douglas*." *Thompson*, 410 F. App'x at 932 (citations omitted) (citing *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973)).

Under *McDonnell Douglas*, "the plaintiff faces the initial burden of presenting a prima facie case of unlawful discrimination." *Kroger Co.*, 319 F.3d at 866 (citing *McDonnell Douglas*, 411 U.S. at 802). The plaintiff does so by introducing evidence that he was: (1) a member of a protected class; (2) subject to an adverse employment action; (3) qualified for the position; and (4) was replaced by a person outside the protected class or treated differently than similarly situated non-protected employees. *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008) (citing *McDonnell Douglas*, 411 U.S. at 802).

If the plaintiff establishes these four elements, the burden shifts to the defendant to "articulate some legitimate, nondiscriminatory reason for taking the challenged action. If the defendant is able to satisfy this burden, the plaintiff must then prove that the proffered reason

was actually a pretext to hide unlawful discrimination." *Kroger Co.*, 319 F.3d at 866 (quotation marks omitted) (quoting *Univ. of Cincinnati*, 215 F.3d at 573).

Here, Defendant contends that Plaintiff has proffered neither direct nor circumstantial evidence of gender discrimination. Plaintiff argues that she has both direct and circumstantial evidence. Each type of evidence is considered in turn.

### A

"As direct evidence," Plaintiff writes, "Plaintiff relies upon comments that were made to her by Deputy Chief Pletzke, in the nature of demeaning words and conduct directed at her. She asserts that he had her fetch coffee and referred to her as toots and sweetie." Pl.'s Resp. 10 (quotation marks omitted). Additionally, Plaintiff points to the firearms training in 2006, explaining: "The failure to require Officer Brad Peter, Plaintiff's husband and the male parent of a newborn baby, to refrain from firearm training, demonstrates the Department's discriminatory treatment of Plaintiff based on her gender. This constitutes direct evidence of discriminatory animus." *Id*.

Plaintiff is correct that she has alleged that Pletzke treated her differently when she first began working as a Bay City Police officer in 2003. Pl. Dep. 120. Yet Plaintiff also implicitly acknowledges that this conduct also stopped in 2003 — several years before Plaintiff was terminated for insubordination (and several other offenses). *See* Pl.'s Resp. 10.

Thus, Plaintiff is not correct that this alleged conduct is direct evidence of discrimination. As the Supreme Court cautions, "stray remarks in the workplace" are not sufficient to shift the burden to "the employer to prove that its [employment] decisions were based on legitimate criteria. Nor can statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself, suffice to satisfy the plaintiff's burden in this regard." *Price*

-21-

*Waterhouse v. Hopkins*, 490 U.S. 228, 277 (1989) (O'Connor, J., concurring); *see also Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 550 (6th Cir. 2004) ("[Using] age-based slurs may well betray a bias that older workers are less valuable or competent.  However, such statements will not constitute direct evidence.  Since the plaintiffs do not allege that they were made in relation to the decision to discharge the plaintiffs . . . an inference is required that such a bias may have played a role in the decision to select these plaintiffs.").

Deputy Chief Pletzke's alleged conduct occurred shortly after Plaintiff was hired in 2003. While it may indicate bias, an inference is required that such a bias factored into Defendant's decision to terminate Plaintiff's employment in 2010 because of her insubordination, refusal to report to work, and job abandonment (as well as other violations of department rules and regulations).

Likewise, an inference is required to suggest that Defendant took other disciplinary action against Plaintiff because of her gender — an inference, moreover, contradicted by Plaintiff's own admissions that she has no evidence that Defendant disciplined Plaintiff because of her gender.  *See, e.g.*, Pl. Dep. 444–46 (acknowledging that she has no evidence that discipline imposed for leaving scene of investigation was discriminatory); Pl. Dep. 508–09 (acknowledging that she has no evidence that discipline imposed for not disclosing her relationship with Officer Blood was discriminatory); Pl. Dep. 548 (acknowledging that she has no evidence that discipline imposed for bar fight was discriminatory); Pl. Dep. 623–25 (acknowledging that she has no evidence that discipline imposed for car accident was discriminatory).

Similarly, while Plaintiff asserts that she was treated differently during the firearms training in 2006, an inference is required that this different treatment was based on discriminatory animus (rather than a genuine, if mistaken, understanding of the risk that firearm

-22-

discharges pose to nursing mothers), and a further inference is required that this discriminatory animus factored into Defendant's decision to terminate Plaintiff's employment in 2010.

Because Plaintiff has not introduced direct evidence of discrimination, she must proceed under the *McDonald Douglas* framework.

**B**

"The prima facie requirement for making a Title VII claim is not onerous," the Sixth Circuit emphasizes, "and poses a burden easily met." *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660 (6th Cir. 2000) (quotation marks omitted) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981); *Wrenn v. Gould*, 808 F.2d 493, 500 (6th Cir. 1987)).

Here, Plaintiff carries her burden. She easily meets the first two elements. A woman, she is a member of a protected class. And she was subject to adverse employment actions — she was repeatedly reprimanded and eventually terminated.

Plaintiff also meets the third element of the prima facie case — she met her employer's legitimate expectations. The Sixth Circuit cautions that "when assessing whether a plaintiff has met her employer's legitimate expectations at the prima facie stage of a termination case, a court must examine plaintiff's evidence independent of the nondiscriminatory reason 'produced' by the defense as its reason for terminating plaintiff." *Cline*, 206 F.3d at 661.

Here, but for the nondiscriminatory reasons for disciplining Plaintiff, then terminating her employment (including leaving the scene of an investigation, engaging in conduct that discredits the department, insubordination, refusal to report, job abandonment, and other violations of department rules and regulations), Plaintiff was qualified for her position.

The fourth element — whether treated differently than similarly situated men — is a closer question. If read narrowly, Plaintiff does not establish the element. She identifies no man,

for example, that was treated more leniently for acts of insubordination, refusal to report to work,

or job abandonment.  Moreover, while Plaintiff identified several officers in her deposition who

she feels were disciplined more leniently because of their gender, she acknowledged that she had

no evidence that gender bias factored into their discipline — or hers.  The first officer Plaintiff

identified was Officer Aldrich.  Pl. Dep. 254.  In her deposition, Plaintiff was asked:

> Q: [D]o you know of any witnesses who will testify that the amount of
> punishment was determined because of your gender or his?
> A: No.
> Q: Do you know of anyone who will testify that there was some unequal
> treatment because of gender?
> A: No.
> Q: Do you have any documents that reflect gender was a consideration in the
> process?
> A: No.

Pl. Dep. 268.  The second male officer identified by Plaintiff is Officer Ritchy.  Again, Plaintiff

acknowledges that she has no evidence that the gentleman's punishment has anything to do with

gender bias.  Pl. Dep. 267–68.  In her deposition she was asked:

> Q: Okay.  And do you know of any witnesses who will testify that the amount of
> punishment was determined because of your gender or his?
> A: No.
> Q: Do you know of anyone who will testify that there was some unequal
> treatment because of gender?
> A: No.
> Q: Do you have any documents that reflect gender was a consideration in the
> process?
> A: No.

Pl. Dep. 268.  The third officer is Officer Doud.  Once again, Plaintiff acknowledges that she has

no evidence that Doud's punishment has anything to do with gender bias.  Pl. Dep. 273.

A fourth officer that Plaintiff identifies is her former spouse, Officer Peter.  For leaving

their child unattended in the police parking lot in October 2009, Plaintiff and Officer Peter

received  the  same  punishment  —  a  written  reprimand.    Pl. Dep. 475–77.    This  was

discriminatory, Plaintiff asserts, because "He's the one that initiated that whole situation and was given the exact same [punishment]."  Pl. Dep. 475–76.  Plaintiff acknowledges that aside from receiving the same punishment as her husband, she has no other evidence that her gender factored into the decision.  Pl. Dep. 477–78.

Drawing all reasonable inferences in Plaintiff's favor, Plaintiff has sufficiently alleged the "comparable non-protected person was treated better" element.  *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582–83 (6th Cir. 1992).  Officer Peter was, perhaps, more culpable.  In Plaintiff's words, "He's the one that initiated that whole situation."  Pl. Dep. 476.  Yet the two received the same punishment, rendering Plaintiff's treatment disproportionately severe.  (Moreover, among the reasons Defendant listed for terminating Plaintiff's employment was her repeated disciplines).  Plaintiff has met the fourth element — and her prima facie case.

## C

Defendant also carries its burden of producing a legitimate, non-discriminatory reasons for disciplining Plaintiff and then terminating her employment — including leaving the scene of an investigation, engaging in conduct that discredits the department, insubordination, refusal to report, job abandonment, and other violations of department rules and regulations.  That is, Defendant asserts that it reprimanded Plaintiff, then terminated her employment, because she repeatedly broke department rules, then, in an act of knowing insubordination, violated direct orders to appear and explain why she was violating the terms of her suspension.

Plaintiff does not dispute this, but instead contends that Defendant's reasons for reprimanding her and terminating her employment are "merely pretextual."  Pl.'s Resp. 10.  Put differently, Plaintiff argues that a reasonable person would find Defendant's explanation of its decision simply incredible. Plaintiff's argument lacks merit.

"To make a submissible case on the credibility of [an] employer's explanation," the Sixth Circuit instructs, "the plaintiff is required to show by a preponderance of the evidence either (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate [the adverse employment action], or (3) that they were insufficient to motivate [the adverse employment action]." *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 460 (6th Cir. 2004).

"The first type of showing," the court elaborates, "consists of evidence that the proffered bases for the plaintiff's discharge never happened, i.e., that they are factually false." *Id*. The third is similarly straightforward and "consists of evidence that other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff." *Id*. It is the second type of showing that is the most complex:

> There, the plaintiff admits the factual basis underlying the employer's proffered explanation and further admits that such conduct could motivate dismissal. The plaintiff's attack on the credibility of the proffered explanation is, instead, an indirect one. In such cases, the plaintiff attempts to indict the credibility of his employer's explanation by showing circumstances which tend to prove that an illegal motivation was more likely than that offered by the defendant. In other words, the plaintiff argues that the sheer weight of the circumstantial evidence of discrimination makes it "more likely than not" that the employer's explanation is a pretext, or a coverup.

*Id*. Here, Plaintiff does not contend that the proffered bases for her reprimands and eventual discharge never happened or that other employees engaged in similar acts without being discharged. Instead, Plaintiff tries to fit her claim through the second approach — that the proffered reasons did not actually motivate the adverse employment actions.

To do so, Plaintiff offers three specific "instances of treatment where there is no rational explanation for Defendant's conduct."  Pl.'s Resp. 12.  None, however, are sufficient to get her case to a jury.

### 1

The first instance Plaintiff offers concerns her being placed on light duty after injuring her trigger finger.  Plaintiff writes that "it defies explanation to keep a qualified officer who passed firearm qualification off the street because of a vague verbal complaint of 'soreness' while shooting, especially where the evaluator is not a medical professional. . . .  The more likely explanation is that Plaintiff was sent to do demeaning and ministerial tasks in the office, beneath her qualifications, due to discriminatory animus."  *Id.*

Plaintiff's contention — contradicted by her own deposition testimony — lacks merit.  After injuring her finger, Plaintiff was required to re-qualify with her weapon on the shooting range.  Pl. Dep. 70.  Plaintiff testified that this was reasonable, not discriminatory.  Pl. Dep. 387.  After Plaintiff experienced difficulties firing the weapon, she was ordered to see her doctor, Dr. Exstein.  Pl. Dep. 79–81.  Plaintiff testified that this was also reasonable, not discriminatory.  Pl. Dep. 387.  When Plaintiff saw Dr. Exstein, he ordered an additional three weeks of physical therapy.  Pl. Dep. 78–81.  Plaintiff testified that she feels that the physical therapy was unnecessary and that she could have returned to regular duty immediately, but acknowledges that she does not think that Dr. Exstein treated Plaintiff differently because she is a woman.  Pl. Dep. 80–81.  And Plaintiff acknowledges that in ordering the additional physical therapy her doctor was exercising his independent medical judgment, not carrying out instructions from Defendant.  Pl. Dep. 81.  In her deposition, moreover, Plaintiff acknowledged that "they had a reason to keep me on light duty."  Pl. Dep. 387.  Following up, counsel asked: "So your thought process that

you were being discriminated against is just not accurate, right?" Pl. Dep. 387. "Sure,"
answered Plaintiff. Pl. Dep. 387.

**2**

Plaintiff asserts that "the most egregious example" of treatment where there is no rational
explanation for Defendant's conduct "is the interception of a private and confidential medical
report relating to Plaintiff, holding the report for a week, and then taking Plaintiff off the street
due to unfitness and inability to drive." Pl.'s Resp. 12.

Again, Plaintiff's contention is contradicted by her own deposition testimony. In
December 2009, Plaintiff underwent eye surgery. Pl. Dep. 121. Prior the surgery, her doctor's
office faxed Family Medical Leave Act information to the Bay City Police Department. Pl. Dep.
123.

After Defendant received the document, Plaintiff was taken off active duty. She contends
that this was discriminatory, but acknowledges that she has no evidence that the decision had
anything to do with her sex. Pl. Dep. 288–89. In her deposition, she was asked:

> Q: Now, do you have any documents that suggest that the chief or deputy chief or
> anyone in command at the police department made their decisions relating to
> your time off because of your gender?
> A: I have no documentation for that, no.
> Q: Do you have any witnesses who will testify that that was why they made the
> decisions?
> A: No.

Pl. Dep. 288. Moreover, as noted, Plaintiff acknowledged that the faxed document informed the
reader that Plaintiff was unable to perform her duties as a police officer. Pl. Dep. 329. In sum,
there is a rational explanation for Defendant's conduct — it appears on the face of the document
itself.

**3**

Finally, Plaintiff asserts that "keeping Plaintiff off of the firing range when male officers are just as susceptible to the effects of lead exposure is not capable of explanation." Pl.'s Resp. 12.

Accepting Plaintiff's premise that Defendant's unfounded, paternalist policy towards nursing mothers on the firing range in 2006 was both "ridiculous," Pl. Dep. 130, and evidence of gender bias, this evidence does not create a jury question on Defendant's motive. That is, based on this evidence, no reasonable jury could think it "more likely than not" that Defendant's explanation for repeatedly reprimanding Plaintiff, then terminating her employment in 2010 is mere pretext — and that the real reason that Plaintiff was reprimanded, then had her employment terminated, was Defendant's bias against women.

In sum, Plaintiff does not demonstrate that Defendant's articulated reasons for reprimanding Plaintiff and then terminating her employment were mere pretext. Defendant is entitled to judgment as a matter of law.

**IV**

Accordingly, it is **ORDERED** that Defendant's motion for summary judgment (ECF NO. 26) is **GRANTED**.

It is further **ORDERED** that Plaintiff's complaint is **DISMISSED WITH PREJUDICE**.

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: January 11, 2013

-29-

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on January 11, 2013.

s/Tracy A. Jacobs
TRACY A. JACOBS